IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| MARK ALLEN DAILEY<br>Plaintiff<br><br>v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of<br>Social Security[1] | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 2:11-0098 |

To: The Honorable Thomas A. Wiseman, Jr., Senior District Judge

**REPORT AND RECOMMENDATION**

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for Supplemental Security Income ("SSI") benefits as provided by the Social Security Act ("Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff is not disabled under the Act is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 19) should be DENIED.

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for former Commissioner Michael J. Astrue as the defendant in this suit.

## I. INTRODUCTION

The plaintiff received SSI benefits as a child beginning December 9, 1992, due to a growth impairment and pituitary dwarfism. (Tr. 80, 490.) The Social Security Administration ("SSA") reevaluated the plaintiff's disability when he reached the age of eighteen, and, on October 20, 2003, notified him that he would receive his last SSI benefits in December of 2003. (Tr. 258-60, 490.) After the plaintiff's request for reconsideration was denied, he filed a request for a hearing on October 20, 2004. (Tr. 276-78, 490.) Administrative Law Judge ("ALJ") William P. Newkirk held a hearing on February 15, 2006 (tr. 853-67), and issued an unfavorable decision on June 15, 2006. (Tr. 490-494.) The plaintiff appealed this decision to the Appeals Council (tr. 496-97), which remanded the case for another hearing.[2] (Tr. 500-01.) A second hearing was held before ALJ Newkirk on April 17, 2007 (tr. 868-87), and he again issued an unfavorable decision on September 24, 2007. (Tr. 532-38.) The plaintiff appealed this decision to the Appeals Council (tr. 608-09), and by order dated January 22, 2010, the Appeals Council again remanded the case for another hearing.[3] (Tr. 611-13.) In the meantime, the plaintiff filed a subsequent adult SSI claim with a protective filing date of May 14, 2008. (Tr. 544, 612) On remand, the Appeals Council directed

[2] In its order remanding the case, the Appeals Council instructed the ALJ to "[g]ive further consideration to the [plaintiff's] maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations" and to "[o]btain evidence from a vocational expert to clarify the effect of the assessed limitations on the [plaintiff's] occupational base." (Tr. 500-01.)

[3] The Appeals Council remanded the case a second time because the ALJ had incorrectly applied 20 C.F.R. § 416.994. (Tr. 611-12.) Additionally, the Appeals Council noted that the ALJ did not comply with its original order of remand instructing him to obtain the testimony of a vocational expert. *Id.* The Appeals Council directed that another ALJ be assigned to the case on remand. *Id.*

that the plaintiff's adult claim be associated with his age 18 redetermination claim and a new decision be issued on the associated claims. (Tr. 612.)

A third hearing was held May 3, 2010, before ALJ James A. Sparks. (Tr. 890-99.) On July 16, 2010, ALJ Sparks issued an unfavorable decision as to both claims, finding that the plaintiff's disability ended on May 13, 2003, and that the plaintiff had not become disabled again since that date. (Tr. 19-28.) On September 8, 2011, the Appeals Council denied the plaintiff's request for review, rendering ALJ Sparks' decision the final decision of the Commissioner. (Tr. 11-13.)

## II. BACKGROUND

The plaintiff was born on May 13, 1985, and turned eighteen years old on May 13, 2003. (Tr. 544, 890.) He is 4'1" tall, completed the 12th grade with a special education diploma, and has never worked. (Tr. 891, 895.)

### A. Chronological Background: Procedural Developments and Medical Records

As a child, the plaintiff was found to be disabled under Listing 100.2B as a result of his growth impairment. (Tr. 80.) Reviewing DDS examiners, Drs. Denise Bell and Evelyn Davis, opined in 1998 and 2001, respectively, that the plaintiff continued to meet Listing 100.2B under child disability standards. (Tr. 190-93, 252-57.)

The plaintiff underwent psychological evaluations by the Clay County School System in 1997 and 2000, to determine the suitability of special education services. (Tr. 169-74, 811-14.) On both occasions he was given the Wechsler Intelligence Scale for Children-Third Edition ("WISC-III"). (Tr. 170, 812.) In 1997, he obtained a full scale IQ score of 70, a verbal IQ score of 79, and a

performance IQ score of 65, +/- 3 points. (Tr. 170.) In 2000, he obtained a full scale IQ score of 71, a verbal IQ score of 75, and a performance IQ score of 72. (Tr. 812.) Both sets of test results placed him in the borderline range of intellectual functioning. (Tr. 169-73, 811-13.) At both evaluations, the plaintiff met the state criteria for special education services. (Tr. 173, 814.) He was reevaluated by the school system again in April 2003, and he was found to still require special education due to his "low academic skills and ability." (Tr. 816.) He failed the Tennessee Comprehensive Assessment Program ("TCAP") Competency test in February of 2003. (Tr. 822.)

On November 25, 2002, the plaintiff presented to Dr. Kenneth Beaty in Celina, Tennessee, complaining of right knee pain and requesting a refill of his albuterol inhaler.[4] (Tr. 451.) The plaintiff demonstrated shortness of breath, wheezing, and coughing. *Id.* A chest X-ray was normal (tr. 454), and Dr. Beaty diagnosed the plaintiff with asthma, prescribed albuterol, and advised him to stop smoking. (Tr. 451.) The plaintiff returned to Dr. Beaty with right knee pain on January 23, 2003, and Dr. Beaty prescribed Ibuprofen. (Tr. 450.) An X-ray of the plaintiff's right knee was unremarkable except that the plaintiff had "bony abnormalities" associated with being "an achondroplastic dwarf." (Tr. 453.)

On August 17, 2003, the plaintiff was examined by Tennessee Disability Determination Services ("DDS") consultative examiner Dr. Michael Cox. (Tr. 413-16.) Dr. Cox noted that the plaintiff had "occasional shortness of breath" and used albuterol inhalers but smoked a half pack of cigarettes per day. (Tr. 414.) A physical examination revealed that the plaintiff was "a well-developed, well-nourished pituitary dwarf" with "significant shortening of his extremities." (Tr. 414-

[4] The plaintiff had previously been prescribed an albuterol inhaler for asthmatic bronchitis. (Tr. 451, 393, 395.) Albuterol is a sympathomimetic bronchodilator. Saunders Pharmaceutical Word Book 22 (2009) ("Saunders").

15.) His joint range of motion was "within normal limits with the exception of his elbows," where he lacked full extension and was "only able to obtain 60 to 70 degrees of extension." (Tr. 415.) The plaintiff's gait was "within normal limits," but he was only able to climb onto the examining table "with great difficulty because of his size." *Id.* Dr. Cox's impression was that the plaintiff had "[p]ituitary dwarfism" as well as "[s]ome degree of mental insufficiency diagnosed by previous IQ testing and academic testing." *Id.* Dr. Cox opined that he did "not think that [the plaintiff's] clinical condition ha[d] improved in the past three years." *Id.*

On September 5, 2003, the plaintiff underwent a consultative psychological evaluation with DDS examiner, Mark Loftis, M.A. (Tr. 423-27.) A mental status examination revealed that the plaintiff was oriented with normal affect, did not display psychosis or delusional thinking, was not "overtly" anxious or depressed, and did not have suicidal or homicidal ideation. (Tr. 425-26.) Mr. Loftis noted the presence of a vocal tic, which the plaintiff's mother reported had started recently. (Tr. 426.) The plaintiff reported that he did not drive but "like[d] to stay active" and did chores, hunted, fished, watched television, and went out with his friends "occasionally." (Tr. 424.)

Mr. Loftis administered the Wechsler Adult Intelligence Scale-Third Edition ("WAIS-III"), and the plaintiff obtained a full scale IQ score of 72, a verbal IQ score of 75, and a performance IQ score of 73, which still placed him on the borderline range of intellectual functioning. (Tr. 424-25.) Mr. Loftis noted that "[t]here was no significant difference between [the] standard score obtained on his IQ test and the standard scores obtained in the test that indicates specific learning disability."[5]

---

[5] Presumably, Mr. Loftis was referring to the WISC-III tests administered by the Clay County School System in 1997 and 2000.

(Tr. 426.) Additionally, Mr. Loftis noted that the plaintiff's "adaptive functioning appears to rule out any indication of mental retardation" and that the plaintiff had "a functional literacy." (Tr. 425-26.)

Mr. Loftis found the plaintiff to be "well adjusted" with no evidence of substance abuse, anxiety, depression, or psychopathology. *Id.* He believed that the plaintiff's vocal tic required further examination as it had not been previously addressed. *Id.* Mr. Loftis' functional assessment of the plaintiff indicated that he was able to answer questions and remember "appropriate persons and historical information;" had appropriate social interactions and good interpersonal skills; had an adequate ability to remember; was "capable of following simple instructions;" and did not demonstrate "[s]pecific impairments regarding his ability to interact appropriately in social settings." *Id.* However, Mr. Loftis noted that the plaintiff's "stature and size may preclude him from doing certain occupations" and that he would benefit from vocational rehabilitation training and a referral to a speech pathologist. (Tr. 426-27.)

Dr. Karen Lawrence, a non-examining DDS psychologist, completed a Psychiatric Review Technique on October 13, 2003, concluding that the plaintiff had borderline intellectual functioning. (Tr. 428-440.) Dr. Lawrence determined that the plaintiff had mild limitations in the areas of daily living and maintaining social functioning as well as a moderate limitation maintaining concentration, persistence, or pace. (Tr. 438.) In a mental RFC assessment also completed on October 13, 2003, Dr. Lawrence opined that the plaintiff was moderately limited in five areas: (1) understanding and remembering detailed instructions; (2) carrying out detailed instructions; (3) maintaining attention and concentration for extended periods; (4) performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; and (5) completing a normal workday and workweek without interruptions from psychologically based symptoms and performing

at a consistent pace without unreasonable rest periods. (Tr. 442-43.) Dr. Victor Byron, a nonexamining DDS consultant, completed a mental RFC assessment on December 17, 2003, concluding that the plaintiff had moderate limitations understanding, remembering, and carrying out detailed instructions and maintaining attention and concentration for extended periods. (Tr. 475-77.)

On November 6, 2003, the plaintiff returned to Dr. Beaty with pain and decreased range of motion in his right shoulder, and he was given Decadron and Depo-Medrol.[6] (Tr. 449.) An X-ray of his right shoulder revealed "[b]ony changes compatible with achondroplastic dwarfism" and "some cortical distortion involving the proximal medial aspect of the right humorous." (Tr. 452.)

On December 3, 2003, nonexamining DDS consultant Dr. James Lester completed a physical RFC assessment. (Tr. 455-60.) Dr. Lester opined that the plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently. (Tr. 456.) He also opined that the plaintiff could stand and/or walk for a total of six hours and sit for a total of six hours in an eight-hour workday. *Id.* The plaintiff's ability to push and/or pull was unlimited. *Id.* Dr. Lester based these limitations on the plaintiff's dwarfism and asthma. (Tr. 456-57.) Additionally, Dr. Lester found that, while the plaintiff could occasionally climb ramps and stairs and could frequently balance, stoop, kneel, crouch, and crawl, he could never climb ladders, ropes, or scaffolds. (Tr. 457.) Dr. Lester also found that the plaintiff was limited reaching in all directions, including "reaching overhead bilaterally," but was otherwise unlimited handling, fingering, and feeling. *Id.* According to Dr. Lester, the plaintiff had no visual, communicative, or environmental limitations. (Tr. 458-59.)

[6] Decadron and Depo-Medrol are corticosteroidal anti-inflammatories. Saunders at 204, 210.

On December 1, 2004, the plaintiff presented to Dr. Beaty with mid back pain and right knee pain, and he was prescribed Flexeril[7] and Ibuprofen. (Tr. 483.) On January 24, 2006, the plaintiff presented to Dr. Michael Boles in Celina, Tennessee, with right knee pain. (Tr. 524.) The plaintiff reported that he had fractured his knee cap 3-4 years earlier. *Id.* Dr. Boles recommended that the plaintiff undergo an MRI on his right knee. (Tr. 525.) The plaintiff returned to Dr. Boles on August 15, 2006, complaining of low back pain and reporting that he had been to the emergency room. (Tr. 522.) He was given injections of Decadron and Depo-Medrol. *Id.* On February 23, 2007, the plaintiff presented to Dr. Boles with knee and back pain. (Tr. 518.) He had decreased range of motion in his right knee and difficulty with his gait. (Tr. 519.) Dr. Boles recommended an MRI on the plaintiff's knee and prescribed Anaprox, Darvocet, and a Medrol dose pack.[8] *Id.*

On July 16, 2008, Dr. Jerry Lee Surber physically examined the plaintiff for DDS, without having any of the plaintiff's medical records available to review. (Tr. 825-28.) The plaintiff complained of intermittent low back pain and reported "occasional shortness of breath" and occasional "numbness, burning and tingling in his hands and feet." *Id.* The plaintiff also reported having a prior knee injury but denied current pain in his right knee. *Id.* The plaintiff was 4'1" tall and weighed 195 pounds. (Tr. 826.) Dr. Surber noted that he was well-developed, well-nourished, alert and oriented, and in no acute distress. *Id.* His chest was "[n]ontender with no gross chest wall asymmetry," and his lungs "were bilaterally clear to percussion and auscultation with no audible wheeze, rales or rhonchi." *Id.* Dr. Surber noted that the plaintiff had "full and unlimited mobility in

---

[7] Flexeril is a skeletal muscle relaxant. Saunders at 294.

[8] Anaprox is an analgesic, nonsteroidal anti-inflammatory used to treat mild to moderate pain. Darvocet is a narcotic analgesic. Medrol is a corticosteroid anti-inflammatory. Saunders at 48, 202, 433.

his right and left shoulders, hips, knees, ankles, wrists, hands and fingers including both thumbs." (Tr. 827.) The plaintiff's elbow mobility, however, was limited to "about 75% of full extension with bilateral pronation and supination at 60 to 80 degrees." *Id.* Additionally, the plaintiff "appeared somewhat shaky" standing on his right or left leg, although he was able to perform straight leg raises while sitting and supine and was also able to perform a squat. *Id.* The plaintiff "moved easily from the chair to the examination table" and "was able to perform the straightaway tandem and heel-toe walks," but he had "a wobbly side-to-side type gait." *Id.*

Dr. Surber's clinical impressions were that the plaintiff suffered from obesity; "[c]ongenital dwarfism with slight decreased mobility in both of his elbows and no other joint or major muscle group limitations;" "[s]hortness of breath intermittently during his asthma attacks;" and intermittent pain in his right lower back and right knee. *Id.* Dr. Surber opined that the plaintiff:

> would be able to frequently lift or carry at least 10 to 25 or 30 pounds during up to one-third to two-thirds of an 8-hour workday. He would be able to stand or walk with normal breaks for up to 2 to 6 hours in an 8-hour workday or sit with normal breaks for up to 6 to 8 hours in an 8-hour workday.

(Tr. 828.)

On August 6, 2008, Dr. Marvin Cohn, a nonexamining DDS consultative physician, completed a physical RFC assessment. (Tr. 590-97.) Dr. Cohn opined that the plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently and could stand and/or walk six hours and sit six hours in an eight-hour workday. (Tr. 591.) Dr. Cohn found no limitations pushing or pulling and found that the plaintiff could frequently climb ramps and stairs and could balance, stoop, kneel, crouch, and crawl. (Tr. 591-92.) He also determined that the plaintiff could occasionally climb ladders, ropes, or scaffolds. (Tr. 592.) He found no manipulative, visual, or

communicative limitations and also found no environmental limitations except that the plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. 593-94.) Nonexamining DDS consultative physician Dr. William Downey also completed a physical RFC assessment on September 26, 2008. (Tr. 598-605.) Dr. Downey found limitations identical to those identified by Dr. Cohn in his prior RFC assessment. *Id.*

The plaintiff reported to Dr. Boles on September 23, 2008, complaining that his right knee was "still bothering him." (Tr. 661.) Dr. Boles ordered an X-ray of the knee and a CT scan of the plaintiff's lumbar spine. *Id.* The CT scan, completed October 9, 2008, revealed that the plaintiff had "a congenitally stenotic canal which is accentuated by marked facet hypertrophy and ligamentous hypertrophy at every level showing diffuse canal stenosis throughout the lumbar spine." (Tr. 669.) The X-ray revealed "[n]o acute fracture or joint malalignment" but did show "[d]eformities of the distal femur, proximal tibia and bowing of the fibula." (Tr. 670.) The deformities were attributed to possible "remote trauma" or a "developmental abnormality." *Id.* The plaintiff returned to Dr. Boles several times between November 2008, and April 2010, with complaints of low back and knee pain. (Tr. 664-68, 671-74.) Dr. Boles diagnosed the plaintiff with lumbar stenosis, back pain, and knee pain and variously prescribed Celebrex, Diclofenac, and Mobic.[9] (Tr. 666, 668, 672, 674.) The plaintiff was also admitted to the Cumberland River Hospital emergency room on July 14, 2009, complaining of chronic back pain. (Tr. 655.) A physical exam revealed muscle spasms, and he was prescribed Hydrocodone. (Tr. 656.)

[9] Celebrex, Diclofenac, and Mobic are nonsteroidal anti-inflammatory drugs. Saunders at 141, 222, 457.

On April 14, 2010, Dr. Boles completed a form titled "Medical Assessment of Ability to do Work-Related Activities (Physical)." (Tr. 652-54.) Dr. Boles opined that the plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently.[10] (Tr. 652.) He determined that the plaintiff could stand and/or walk for a total of three hours in an eight-hour day and for two hours without interruption and could sit for three hours total in an eight-hour day and for two hours without interruption. (Tr. 652-53.) Dr. Boles opined that the plaintiff could never climb but could occasionally kneel, crouch, stoop, balance, and crawl. *Id.* He found no limitations reaching, handling, feeling, pushing/pulling, seeing, hearing, or speaking, but found limitations for heights and moving machinery due to the plaintiff's dwarfism. (Tr. 653-54.)

**B. Hearing Testimony**

At the hearing before the ALJ on May 3, 2010, the plaintiff was represented by counsel, and both the plaintiff and Jane Hall, a vocational expert ("VE"), testified. (Tr. 890-98.)

The plaintiff testified that he was twenty-four years old, unmarried, and did not have a driver's license. (Tr. 890-91.) He graduated high school with a special education diploma. *Id.* The plaintiff testified that he experiences pain in his back and legs. (Tr. 893-94.) He said that he received a prescription for Hydrocodone after he went to the emergency room approximately two weeks before the hearing. (Tr. 894.) Before that time, he had last taken pain medicine nine years earlier when he fractured his knee. *Id.* He relayed that Hydrocodone provides "some" pain relief, and lying down and relaxing also help. *Id.* He testified that cold weather "makes [his] bones hurt." (Tr. 895-

[10] The form defined "occasionally" as up to one-third of an eight-hour day and "frequently" as one-half to two-thirds of an eight-hour day. (Tr. 652.)

96.) The plaintiff estimated that he can stand for ten minutes, walk one hundred feet, and lift approximately ten pounds, but he cannot bend, stoop, or squat. (Tr. 894-95.) He also estimated that he could only sit in a chair for ten minutes before he must stand up, and he indicated that he was in pain while sitting at the hearing. *Id.* He rated his average pain on a 1-10 scale as a seven with pain medication and a nine without medication. *Id.* He is able to bathe, dress, and watch television, but he does not use a computer or wash his laundry. (Tr. 895-96.) He has never worked or attempted to work. (Tr. 895.)

The ALJ asked the VE to consider a hypothetical person who "can walk, stand, and sit three hours each in an eight-hour day, two hours each without interruption;" can occasionally lift or carry twenty pounds and frequently lift or carry ten pounds; can occasionally balance, stoop, kneel, crouch, and crawl; but cannot climb ladders or work around heights or machinery and suffers mild pain. (Tr. 896-97.) The VE replied that such a person would be limited to light work and could perform representative jobs such as cashier, production worker, and machine operator. (Tr. 897.) The VE testified that such jobs would be available in significant numbers in the regional and national economies. *Id.* The ALJ then asked whether any jobs would be available if the hypothetical person was also limited by "moderate to severe pain with extreme obesity," and the VE responded that such limitations would preclude all employment. *Id.*

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on July 16, 2010. (Tr. 19-28.) Based on the record, the ALJ made the following findings:

1. The claimant attained age 18 on May 13, 2003, and was eligible for supplemental security income benefits as a child for the month preceding the month in which he attained age 18. The claimant was notified that he was found no longer disabled as of May 13, 2003, based on a redetermination of disability under the rules for adults who file new applications.

2. Since reaching age 18 on May 13, 2003, the claimant has had the following severe impairments: Congenital Dwarfism; Obesity; Asthma; Borderline Intellectual Functioning (20 CFR 416.920(c)).

***

3. Since reaching age 18 on May 13, 2003, the claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

***

4. After careful consideration of the entire record, the undersigned finds that since May 13, 2003, the claimant has had the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he can walk, stand, and sit (each) for only three hours in an eight hour day for two hours (each) at a time; can frequently lift and carry ten pounds; can occasionally lift and carry twenty pounds; cannot climb ladders; can occasionally stoop, kneel, crouch and crawl; suffers mild pain; cannot work around heights or machinery.

***

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on May 13, 1985 and is a younger individual age 18-49 (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Since May 13, 2003, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in

significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

***

10. The claimant's disability ended on May 13, 2003, and the claimant has not become disabled again since that date (20 CFR 416.987(e) and 416.920(g)).

(Tr. 21-28.)

## IV. DISCUSSION

### A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427-28, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)); *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th

Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs*., 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)); 20 C.F.R. § 416.920. The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. 20 C.F.R. §§ 404.1520(a)(4)(I), 416.920(a)(4)(I). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). This step, however, is not used for redetermining disability at age 18. 20 C.F.R. § 416.987(b).

Second, the plaintiff must show that he suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S. Ct. 376, 157 L. Ed.2d 333 (2003) (citing 20 C.F.R. §§

404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. §§ 404.1521(b), 416.921(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f). The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears

the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir.1997)). *See also Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L. Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, he is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

**B. The five-step inquiry**

In this case, the ALJ resolved the plaintiff's claim at step five of the five-step process. (Tr. 27-28.) As the ALJ noted, step one was inapplicable because the case involved an age-18 redetermination. (Tr. 20.) *See* 20 C.F.R. § 416.987(b). At step two, the ALJ determined that the plaintiff had the severe impairments of congenital dwarfism, obesity, asthma, and borderline intellectual functioning. (Tr. 22.) At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Id.* Next, the ALJ determined that the plaintiff had the residual functional capacity to perform light work with certain additional limitations. *Id.* At step four, the ALJ found that the plaintiff had no past relevant work. (Tr. 26.) At step five, the ALJ determined that the plaintiff was capable of performing work as a cashier, production worker, and machine operator because these jobs did not require the performance of work-related activities precluded by the plaintiff's residual functional capacity. (Tr. 27-28.) Consequently, the ALJ concluded that the plaintiff's disability ended on May 13, 2003, when he turned 18 years old, and that he had not become disabled again since that date. (Tr. 28.)

**C. The Plaintiff's Assertions of Error**

The plaintiff does not clearly set out his assertions of error in his memorandum in support of his motion for judgment on the administrative record. However, it appears that the plaintiff's arguments are that the ALJ erred by: (1) failing to properly weigh the medical evidence; (2) failing to properly evaluate the plaintiff's subjective complaints of pain; (3) failing to properly consider the impact of the plaintiff's obesity; (4) failing to properly evaluate the severity of the plaintiff's mental impairments; and (5) failing to properly "apply" the VE's testimony about the jobs available to him "considering both his physical and mental limitations." Docket Entry No. 20, at 13.

**1. The ALJ properly weighed the medical opinion evidence.**

The plaintiff first argues that the ALJ improperly weighed the medical opinion evidence. Docket Entry No. 20, at 8-9. Specifically, the plaintiff argues that the ALJ "failed to properly analyze or assign appropriate weight" to Dr. Boles' opinion. *Id.* He also asserts that the ALJ did not address Dr. Cox's opinion or the opinions of prior consultative examiners who found the plaintiff disabled as a child. *Id.* at 13.

According to the Regulations, the SSA "will evaluate every medical opinion" that it receives. 20 C.F.R. § 416.927(c). However, every medical opinion is not treated equally, and the Regulations describe three classifications for acceptable medical opinions: (1) nonexamining sources; (2) nontreating sources; and (3) treating sources. A nonexamining source is "a physician, psychologist, or other acceptable medical source[11] who has not examined [the claimant] but provides

[11] The Regulations define acceptable medical sources as licensed physicians, both medical and osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 416.913(a).

a medical or other opinion in [the claimant's] case." 20 C.F.R. § 416.902. A nontreating source is described as "a physician, psychologist, or other acceptable medical source who has examined [the claimant] but does not have, or did not have, an ongoing treatment relationship with [the claimant]." *Id.* Finally, the Regulations define a treating source as "[the claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Id.* An "ongoing treatment relationship" is a relationship with an "acceptable medical source when the medical evidence establishes that [the claimant] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.*

Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating source, as compared to the medical opinion of a non-treating source, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2).[12] *See also Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. Aug. 31, 2010); *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009). This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

---

[12] Effective March 26, 2012, the numbering for the treating physician rules changed. Section 416.927(d)(2) became section 416.927(c)(2), and the "identically worded and interpreted" section 404.1527(d)(2) became section 404.1527(c)(2). *See Johnson-Hunt v. Comm'r of Soc. Sec.*, 2012 WL 4039752, at *6 n.6 (6th Cir. Sept. 14, 2012).

Even if a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighed using all of the factors provided in [20 C.F.R. 416.927] . . . .*'" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. 2006) (quoting current 20 C.F.R. § 404.1527(c)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (citing current 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937-38 (6th Cir. 2011). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* If an ALJ fails to adhere to this procedural requirement, the case should be remanded for further clarification.[13] *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-45 (6th Cir. 2004).

---

[13] The rationale for the "good reasons" requirement is to provide the claimant with a better understanding of the reasoning behind the decision in his case and to ensure that the ALJ properly applied the treating physician rule. *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

**a. Dr. Boles' opinion**

The plaintiff argues that the ALJ "failed to properly analyze or assign appropriate weight" to Dr. Boles' medical opinion. Docket Entry No. 20, at 8-9. The Commissioner counters that the ALJ specifically gave "great weight" to Dr. Boles' opinion. Docket Entry No. 22, at 5-6.

In summarizing the medical evidence, the ALJ discussed the plaintiff's treatment history with Dr. Boles as follows:

> With respect to the claimant's alleged back and leg pain, the claimant's treating physician is Dr. Michael Boles. Dr. Boles has treated the claimant since 2006, and is familiar with the MRI of the claimant's lumbar spine performed on October 9, 2008 which revealed the claimant had congenital canal stenosis with an acquired canal stenotic component due to hypertrophic bony and ligamentous changes. . . . He has also treated the claimant for back pain, right knee pain and asthma, and is familiar with the fact that the claimant continues to smoke up to a pack of cigarettes a day against medical advice. Similarly, he is aware of X-rays of the claimant's right knee showing deformities of the distal femur, proximal tibia and bowing of the fibula. . . . Finally he is aware of the claimant's obesity. . . .
>
> The claimant submitted a Medical Source Statement from Dr. Boles in which Dr. Boles has provided a medical assessment of the claimant's ability to do physical work-related activities. . . . Dr. Boles opined the claimant has the ability to occasionally lift 20 pounds; frequently lift 10 pounds; stand and/or walk for a total of three hours in an eight hour day for two hours at a time; sit for a total of three hours in an eight hour day for two hours at a time; never climb; occasionally stoop, kneel, balance, crouch, and crawl; and avoid heights and moving machinery.

(Tr. 23.) (Internal citations and original emphasis omitted). The ALJ gave "great weight to Dr. Boles' opinion as he is the claimant's treating physician" and specifically incorporated "[a]ll of

the restrictions enumerated" in Dr. Boles' "Medical Source Statement"[14] into the plaintiff's RFC. (Tr. 26.)

The plaintiff argues that, although the ALJ purported to adopt Dr. Boles' limitations, he did not in fact do so. Docket Entry No. 20, at 9. Dr. Boles' medical assessment is a pre-printed form with handwritten sections indicating that, in an eight-hour workday, the plaintiff can "stand and/or walk" for three hours total, two without interruption, and can sit for three hours total, two without interruption. (Tr. 652.) In the ALJ's decision, he interpreted Dr. Boles' opinion to be that the plaintiff can "walk, stand, and sit (each) for only three hours in an eight hour day for two hours (each) at a time." (Tr. 22.) The plaintiff contends that Dr. Boles limited him to six hours of work activity in an eight hour day, with a total of three hours standing/walking and three hours sitting. Docket Entry No. 20, at 9.

The plaintiff argued for the same interpretation at the hearing. However, the ALJ rejected the plaintiff's argument and indicated that his interpretation differed from the plaintiff's. (Tr. 897-98.) To the extent that Dr. Boles' opinion is susceptible to two interpretations, the Court does not find error with the ALJ's interpretation. Moreover, the ALJ only gave great weight, not controlling weight, to Dr. Boles' opinion. (Tr. 26.) The ALJ also gave weight to Dr. Surber's opinion after finding that it was "essentially consistent" with Dr. Boles' opinion. *Id.* Dr. Surber opined that the plaintiff "would be able to stand or walk with normal breaks for up to 2 to 6 hours in an 8-hour workday or sit with normal breaks for up to 6 to 8 hours in an 8-hour workday." (Tr. 828.)

---

[14] The plaintiff and the ALJ both refer to Dr. Boles' "Medical Source Statement." Docket Entry No. 20, at 8; (tr. 23). The Court assumes that the plaintiff and ALJ are referring to Dr. Boles' "Medical Assessment of Ability to do Work-Related Activities (Physical)" completed on April 14, 2010 (tr. 652-54), as that is the only medical opinion by Dr. Boles contained in the record.

Dr. Surber's opinion provided additional support for the ALJ's conclusion that the plaintiff could work an eight-hour day.[15] The ALJ did not err in the weight that he gave Dr. Boles' opinion, and the RFC that the ALJ formulated consistent with Dr. Boles' opinion is supported by substantial evidence in the record.

**b. Dr. Cox's opinion**

In the summary portion of his brief, the plaintiff asserts in passing that the ALJ did not address the opinion of consultative DDS physician Dr. Cox. Docket Entry No. 20, at 13. Dr. Cox physically examined the plaintiff on August 17, 2003, and opined that the plaintiff's condition had not "improved in the past three years." (Tr. 413-16.) Dr. Cox noted the plaintiff's "occasional shortness of breath," pituitary dwarfism, "significant shortening of . . . extremities," and limited range of motion in his elbows. (Tr. 414-15.) Dr. Cox also noted that the plaintiff had "some degree of mental insufficiency" based upon his performance at school and on previous IQ tests. (Tr. 415.)

Initially, the Court disagrees with the plaintiff's contention that the ALJ did not address Dr. Cox's opinion. Although his analysis lacks specificity, the ALJ stated that he reviewed the opinions of the "State Agency physicians'" but gave them little weight because they were inconsistent with the medical evidence. (Tr. 26.) Although Dr. Cox was not specifically named, as an examining DDS physician, he fell within the category of "State Agency physicians."

More importantly, however, Dr. Cox's opinion did not ascribe any specific functional limitations to the plaintiff. The impairments that Dr. Cox described, pituitary dwarfism, borderline

[15] Although the ALJ chose to not give their opinions weight, Drs. Lester, Cohn, and Downey each opined that the plaintiff could stand and/or walk six hours and sit six hours in an eight-hour workday. (Tr. 456, 591, 599.)

intellectual functioning, shortness of breath, and shortening and limited motion in the extremities, were addressed in the opinions of Dr. Boles, Dr. Surber, and the other DDS consultative physicians. Dr. Cox's diagnoses were not unique or otherwise different from those of the plaintiff's other doctors. Aside from these diagnoses, Dr. Cox did not opine as to the plaintiff's level of functioning. It is a plaintiff's functional limitations, not his diagnosis, that determines whether he is disabled. *Henderson v. Apfel*, 142 F. Supp. 2d 943, 945 (W.D. Tenn. 2001) (citations omitted).

The plaintiff mentions Dr. Cox's comment that "[a]t this point, [the plaintiff] is disabled because of his dwarfism." Docket Entry No. 20, at 3; tr. 413. However, Dr. Cox made this statement when reciting the plaintiff's medical history, and it does not constitute a medical opinion. Further, to the extent that such a statement could be construed as an opinion that the plaintiff is disabled, the ALJ is not required to accept such a conclusion on the "ultimate issue of disability." *Maple v. Apfel*, 14 Fed. Appx. 525, 536 (6th Cir. 2001). *See also* 20 C.F.R. § 416.927(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."). Likewise, Dr. Cox's statement that the plaintiff's condition has not "improved in the past three years" (tr. 415) is not particularly relevant in light of the fact that medical improvement is not the appropriate standard for an age-18 redetermination. *See* 20 C.F.R. §§ 416.987(b), 416.994.

**c. Opinions of consultative physicians as to childhood disability**

The plaintiff also asserts that the ALJ did "not even mention the opinions of the three previous physicians who found [the plaintiff] disabled prior to reaching the age of 18." Docket Entry No. 20, at 13. It is not entirely clear to which opinions the plaintiff is referring. The Court assumes

that the plaintiff is referring to the medical opinions of DDS physicians related to the plaintiff's initial disability determination in 1992 (tr. 79) and later reevaluations in 1998 (tr. 190-93) and 2001 (tr. 252-57). Each of these medical opinions evaluated the plaintiff's impairments under the criteria for childhood disability. However, the SSA reviews childhood disability claims under different criteria than it uses for adult claims. *Compare* 20 C.F.R. § 416.924 (discussing three-step sequential process for evaluating disability for children) *with* 20 C.F.R. § 416.920 (discussing five-step sequential process for evaluating disability for adults). Moreover, the prior consultative physicians determined that the plaintiff met a listing only applicable to children.[16] Consequently, these medical opinions, which predated the relevant period of disability and applied childhood disability standards, were of little relevance to the ALJ in determining the plaintiff's disability eligibility as an adult. The ALJ did not err by omitting these opinions from his written decision.

**2. The ALJ properly evaluated the plaintiff's subjective complaints of pain.**

Without providing any cogent argument, the plaintiff makes an oblique reference to "objective findings [supporting the plaintiff's] subjective complaints of disabling pain" and later directs the Court to the "applicable case law and regulations" for evaluating a plaintiff's subjective complaints of pain. Docket Entry No. 20, at 11-13. The Court interprets the plaintiff's argument to be that the ALJ erred in assessing his subjective complaints of pain.

An ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision of credibility rests with the ALJ. The ALJ's credibility finding is entitled to

---

[16] The plaintiff was found to be disabled as a child under Listing 100.02B. (Tr. 80.) However, there is no corresponding growth impairment listing for adults. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

deference "because of the ALJ's unique opportunity to observe the claimant and judge [his] subjective complaints." *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp. 2d 954, 958 (N.D. Ohio 2003) (citing *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994)).

Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186, at *4. In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id.* at *5. Consistency between the plaintiff's subjective complaints and the record evidence "tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect." *Kalmbach v. Comm'r of Soc. Sec.,* 2011 WL 63602, at *11 (6th Cir. Jan. 7, 2011). The ALJ must explain his credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4.

Both the SSA and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. *See* 20 C.F.R. §§ 404.1529; 416.929; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit, in *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[17] The

[17] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n.2.

*Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039 (quoting *Duncan*, 801 F.2d at 853). The second prong has two parts: "(1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

In this case, the ALJ found that:

> [T]he claimant's medically determinable impairments could reasonably be expected to *some* of cause [sic] the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.
>
> Having considered the criteria of 20 CFR 404.1529 and Social Security Ruling 96-7p, the undersigned finds the claimant's subjective complaints of pain are not fully credible. The claimant's *description of the severity of the pain has been so extreme as to appear implausible*. First, it should be noted that the claimant does not take any narcotic pain medications, indicating that Dr. Boles, his treating physician, does not believe that such strong medication is necessary to alleviate his pain. Although the claimant was able to obtain a limited amount of narcotics from the emergency room immediately before the hearing, this attempt to bolster his case, has had a negative impact upon his credibility. As noted above, his treating physician would not prescribe this pain medication. Further, the claimant testified that prior to this he had not taken narcotic pain medication for 10 years.
>
> Second, Dr. Boles[,] his treating physician, has stated that in his opinion, the claimant can perform all the activities the claimant denied for far greater lengths of time than the claimant indicated. For example, he found the claimant could sit for two hours at a time. By contrast the claimant testified he could sit for 10 minutes at a time. Further, the claimant's description of the symptoms has been quite vague and general, lacking the specificity which might otherwise make it more convincing. Further, the claimant's contention that his activities of daily living are severely circumscribed by pain is not supported by his own descriptions. For example, the claimant described his back and knee pain as occurring only occasionally or

intermittently. . . . The claimant['s] daily activities as described to the consulting examining psychologist were also in stark contrast to his testimony. For example, he stated to Mr. Loftis that he went hunting and fishing, helped with the household chores, and went out socially with his friends.

Third, the claimant has not generally received the *type of medical treatment* one would expect for a totally disabled individual, which suggests that the symptoms may not have been as serious as has been alleged in connection with this application and appeal. The record reflects significant gaps in the claimant's history of treatment for several of his alleged severe impairments, and when the claimant *has* received treatment, that treatment has been essentially routine and/or conservative in nature. The claimant has never had surgery or mental health treatment. The claimant takes over the counter pain medications in spite of the allegations of quite limiting pain. While the claimant has been prescribed and has taken appropriate medications for asthma, he has only occasional asthma attacks and he did not ascribe any limitations to these occasional attacks. The claimant has not alleged any side effects from his asthma medication.

Finally, the undersigned notes the claimant *continues to smoke despite having asthma*. It is a well-established rule that in order to receive benefits, the claimant must follow treatment prescribed by his doctor if this treatment can restore his ability to work. Upon failure to follow the prescribed treatment, benefit payments may be stopped, or in this case taken into consideration in not awarding benefits. (20 CFR 416.930(b)). The claimant is still smoking against medical advice, when quitting smoking would improve his asthma. This is one additional factor that warrants the denial of his claim.

(Tr. 25-26.) (Emphases in original; internal citations omitted.).

The ALJ satisfied the first prong of the *Duncan* test when he concluded that the plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms. (Tr. 25.) Given that the second prong of the *Duncan* test consists of two alternatives, the plaintiff must only meet one of the following two elements: the objective medical evidence "confirms the severity of the alleged pain arising from the condition" or the "objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." The SSA provides a checklist of factors to assess symptoms, including pain, in 20

C.F.R. § 416.929(c). The ALJ cannot ignore a plaintiff's statements detailing the symptoms, persistence, or intensity of his pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. § 416.929(c)(2). Besides reviewing medical records to address the credibility of a plaintiff's symptoms of pain, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. § 416.929(c)(3).[18] *See also* 20 C.F.R. § 404.1529(c)(3).

Here, the ALJ set forth a detailed analysis evaluating the factors in 20 C.F.R. § 416.929(c)(3) and concluding that the plaintiff's subjective complaints of pain were not disabling. Relying on the plaintiff's testimony and the medical record, the ALJ discussed, *inter alia*, the plaintiff's daily activities; the location, duration, frequency, and intensity of the plaintiff's pain; the plaintiff's medication and treatment history; and several other factors regarding the plaintiff's allegations of pain. (Tr. 25-26.) The ALJ concluded that the plaintiff's allegations were "so extreme as to appear implausible." (Tr. 25.) The ALJ's decision clearly indicates that he complied with *Duncan*, Social Security Ruling 96-7p, and 20 C.F.R. § 416.929 in evaluating the plaintiff's subjective complaints.

---

[18] The seven factors include: (i) the plaintiff's daily activities; (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms; (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms; (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on his back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) other factors concerning the plaintiff's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c)(3).

**3. The ALJ properly considered the plaintiff's obesity.**

The plaintiff argues that the ALJ failed to make a "detailed analysis" of the plaintiff's obesity, citing Social Security Ruling 02-01p. Docket Entry No. 20, at 9-10.

Social Security Ruling ("SSR") 02-01p, which details the Social Security Administration's ("SSA") policy on obesity, provides that, even though the SSA no longer classifies obesity as a listed impairment, adjudicators must still consider its effects when evaluating an individual's residual functional capacity. Soc. Sec. Rul. 02-01p, 2000 WL 628049, at *1. Accordingly, SSR 02-01p provides that:

> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time . . . [O]ur RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

*Id.* at *6.

The Sixth Circuit has held that SSR 02-01p does not offer "'any particular procedural mode of analysis for obese disability claimants.'" *Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 443 (6th Cir. Aug. 12, 2010) (quoting *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 412 (6th Cir. 2006)). Rather, it provides that "obesity, in combination with other impairments, 'may' increase the severity of the other limitations." *Id.* (quoting *Bledsoe*, 165 Fed. Appx. at 412). However, obesity should be evaluated on a case by case basis because it "*may or may not* increase the severity or functional limitations of the other impairment." Soc. Sec. Rul. 02-01p, 2000 WL 628049, at *6 (emphasis added). An ALJ's explicit discussion of the plaintiff's obesity indicates sufficient consideration of his obesity. *See Coldiron*, 391 Fed. Appx. at 443. The Sixth Circuit has also held

that an "ALJ does not need to make specific mention of obesity if he credits an expert's report that considers obesity." *Bledsoe*, 165 Fed. Appx. at 412 (citing *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)).

In this case, the ALJ specifically noted that the plaintiff was 4'1" tall and weighed 195 pounds (tr. 22),[19] and he found the plaintiff's obesity to be a severe impairment. (Tr. 23.) The ALJ noted that Dr. Boles was aware of the plaintiff's obesity (tr. 23) and that Dr. Boles "[did] not attribute any functional limitations to the claimant's obesity." (Tr. 24.) The ALJ also noted that Dr. Surber had considered the plaintiff's obesity but had not detected any limitation of mobility except in the elbows. (Tr. 24-25, 827.) In sum, the ALJ discussed the plaintiff's obesity throughout his findings and gave weight to the opinions of physicians, notably Drs. Boles and Surber, who had considered the plaintiff's obesity when formulating their opinions. Given the ALJ's thorough discussion of the plaintiff's obesity, as well as the ALJ's reliance on the opinions of physicians who had also considered the plaintiff's obesity, the Court concludes that the ALJ adequately considered the effect of obesity on the plaintiff's ability to work.

**4. The ALJ properly evaluated the severity of the plaintiff's mental impairments.**

The plaintiff argues that the ALJ "failed to properly analyze the severity of the [plaintiff's] mental impairments." Docket Entry No. 20, at 13. He points to IQ tests conducted by the Clay

---

[19] As the plaintiff notes, these measurements indicate a Body Mass Index ("BMI") of 57.1. (Tr. 651.) According to the Centers for Disease Control and Prevention at CDC.gov, BMI "is a number calculated from a person's weight and height . . . [and] is a reliable indicator of body fatness for most people." Clinical Guidelines define a BMI greater than or equal to 40 as "extreme" obesity. Soc. Sec. Rul. 02-01p, 2000 WL 628049, at *2 (citing NIH Publication No. 98-4083, September 1998).

County School System when he was a minor to support his argument that his mental impairments affected his "ability to perform work related functions." *Id.*

With regard to the evaluation of mental abilities in determining a plaintiff's RFC, the Regulations provide:

> When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce your ability to do past work and other work.

20 C.F.R. § 416.945(c).

Here, the ALJ discussed the IQ testing done by the Clay County School System and concluded that the plaintiff's "IQ scores improved while he was in school." (Tr. 23.) The ALJ also noted that, in 1997, the plaintiff's full scale IQ score was 70, his verbal IQ score was 79, and his performance IQ score was 65. *Id.* In 2000, the plaintiff's full scale IQ score was 71, his verbal IQ score was 75, and his performance IQ score was 72. *Id.* The ALJ noted that the school psychologist had concluded that the plaintiff's functioning was in the borderline range and also noted that the plaintiff's scores and the school psychologist's findings in 2000 were consistent with the findings of consulting psychological examiner Mark Loftis in 2003. *Id.*

When Mr. Loftis tested him, the plaintiff's full scale IQ score was 72, his verbal IQ score was 75, and his performance IQ score was 73. (Tr. 425.) Mr. Loftis found that the plaintiff was in the borderline range of intellectual functioning but found that the plaintiff's adaptive functioning ruled out mental retardation. (Tr. 425-26.) The plaintiff relayed to Mr. Loftis that he performed chores at home, enjoyed hunting and fishing, watched television, went out with friends "occasionally," and

"liked to stay active." (Tr. 424.) Discussing Mr. Loftis' functional assessment of the plaintiff, the ALJ noted that:

> Mr. Loftis found the claimant demonstrated the ability to answer questions and remember appropriate persons and historical information; he had an adequate ability to remember and was capable of following simple instructions. He had good interpersonal skills; his social interactions were appropriate; and he had no specific impairments in his ability to interact appropriately in social settings.

(Tr. 24.) After noting that the plaintiff did not have a treating psychologist or psychiatrist, the ALJ gave great weight to Mr. Loftis' opinion that the plaintiff did not have significant functional limitations.[20]

The ALJ analyzed the evidence of record regarding the plaintiff's intellectual functioning level in accordance with the Regulations. The ALJ ultimately placed great weight in Mr. Loftis' opinion that the plaintiff was not functionally limited in any significant way. The record indicates that the plaintiff is in the borderline range of intellectual functioning but is still able to perform work-related activities. The ALJ did not err in analyzing the plaintiff's mental capabilities.

**5. The ALJ properly relied on the VE's testimony.**

Finally, the plaintiff vaguely argues that the ALJ erred in formulating his hypothetical question to the VE. Docket Entry No. 20, at 11-13. In support of his argument, the plaintiff recites the VE's response to the ALJ's second hypothetical question, *id.* at 11-12, and then asserts in summary fashion that the ALJ "failed to properly apply the findings of the Vocational Expert regarding jobs available in the local or regional economy considering both his physical and mental

[20] Mr. Loftis opined that the plaintiff's "stature and size may preclude him from doing certain occupations." (Tr. 426.) The ALJ took these physical, as opposed to mental, limitations into account elsewhere in his decision. (Tr. 22-26.)

limitations." *Id.* at 13. Although not entirely clear, it appears that the plaintiff finds fault with the fact that the ALJ did not incorporate the limitations contained in the second hypothetical when the VE testified that such additional limitations would preclude all work. It also appears that the plaintiff faults the ALJ for not including mental limitations in his RFC.

A VE's testimony is commonly used at step five in the sequential analysis to determine whether a plaintiff is capable of performing his past relevant work. *See Delgado v. Comm'r of Soc. Sec.*, 30 Fed. Appx. 542, 548 (6th Cir. 2002). The VE's testimony in response to an ALJ's hypothetical question will be considered substantial evidence only if the hypothetical question "accurately portrays [the plaintiff's] individual physical and mental impairments.'" *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 429 (6th Cir. 2007) (quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)). Although a hypothetical must accurately portray a plaintiff's impairments, an ALJ "is required to incorporate only those limitations that he accepts as credible." *Id.* (quoting *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

At the hearing, the ALJ asked the VE whether a hypothetical person could perform any jobs in significant numbers if that person could "walk, stand, and sit three hours each in an eight-hour day, two hours each without interruption;" occasionally lift or carry twenty pounds and frequently lift or carry ten pounds; occasionally balance, stoop, kneel, crouch, and crawl; but could not climb ladders or work around heights or machinery and suffers mild pain. (Tr. 896-97.) The VE replied that such a person would be limited to light work and could work as a cashier, production worker, or machine operator. (Tr. 897.) The ALJ then asked whether such a person could perform any jobs with

the additional limitations of "moderate to severe pain with extreme obesity." *Id.* The VE responded that these additional limitations would preclude all work. *Id.*

The Court concludes that the ALJ did not err in formulating his hypothetical question to the VE or in determining the plaintiff's RFC. The ALJ was not required to include limitations in his hypothetical question that he found incredible or unsupported by the record. *See Griffeth*, 217 Fed. Appx. at 429. As noted above, the ALJ found that the plaintiff's complaints of pain were "not fully credible" and "so extreme as to appear implausible." (Tr. 25.) The ALJ concluded instead that the plaintiff suffered from mild pain and included such a limitation in the plaintiff's RFC. (Tr. 22.) As evident from these findings, the ALJ did not credit the plaintiff with moderate to severe pain as posited in the alternative, second hypothetical. Consequently, the ALJ was not required to rely on the VE's testimony that such additional limitations would preclude all work. Likewise, as noted above, the ALJ did not find that the plaintiff was functionally limited by obesity or by his borderline intellectual functioning. Consequently, the ALJ was not required to include such limitations in his hypothetical question or RFC.

## V. RECOMMENDATION

For the above stated reasons, it is respectfully recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 19) be DENIED and the Commissioner's decision be AFFIRMED.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made.



Case 2:11-cv-00098 Document 23 Filed 04/25/13 Page 36 of 37 PageID #: 1022

Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

JULIET GRIFFIN
United States Magistrate Judge